Good morning. My name is Philip Weidner. I'm here on behalf of CIP, or Polar Equipment. I intend to use approximately nine minutes for my opening remarks. Mr. Weigel, on behalf of Nautilus Marine, will do most of the rebuttal. Fine. And that is your total time, so you'll have to help keep track of your own time. All right. Thank you. And I've used a bit already, so I'm going to start. May it please the Court, all persons assembled. Mr. Weidner, CIP and Nautilus Marine filed direct actions 20 years ago. It's almost the end of the day. We're here today to decide who, under normal doctrines of law and commercial paper, receive a slice of the pie, so to speak, the pie referred to by Your Honor in the Seattle 7 decision. Mr. Weidner, I've been trying to understand this, and I want to make sure I've got it right in structure. As I understand it, the Polar Equipment case is an opt-out case. They opted out of the class. Is that right? No. No. There's a mandatory class, but we filed direct actions. I'm sorry, Your Honor. Direct actions initially. Back in 89, CIP filed. CIP is one of the lead plaintiffs. In fact, it's one of the lead plaintiffs on the caption on the recent decision on the interest. I had thought you opted out and made a separate settlement in 2003. We didn't really opt out. Here's what happened. A bottom line. I have to speak a little fast because I'm worried about my time here, so I accept my apologies on that. Just so I can understand it. Here's the bottom line. Both Nautilus and CIP started direct actions. For years, they're still class members. Everybody's a member of the class. For years, they were part of the joint prosecution agreement. In 2003, because they'd been basically thrown out of the matrix in some of these prior opinions from this court, we agreed with the plaintiffs' committee to go our own way. Right. Basically, and we agreed whatever you collect and just collect the bias crucial, you keep. It's kind of the, excuse my. . . Whatever you collect, you keep. Exactly. And it's just, it was an expression that's kind of a rough one, but among the plaintiffs' lawyers, you eat what you kill. And that's what it is here. And we spent hundreds and hundreds of thousands of dollars getting ready to go to trial against Exxon. Myself and Mr. Weigel took, I don't know, 40, 50 depositions, thousands of hours of attorney's times, and the court outsteps and settled with Exxon. The proceeds of that Exxon settlement was a reassignment back and a release of the c-back rights, which Your Honor blessed in the Seattle 7 opinion. And I just read Your Honor's dissent in the interest opinion. And with all due respect to the other judges, I agree with you. Commercial papers, commercial paper. We have this commercial paper. And I appreciate the opportunity to illustrate what happened here was, is on the compensatory damages, 11% basically went to the Seattle 7 off the top, 3% the native corporation. We've got 5%. We've got 5% of the real compensatory damages, which is the foundation of the punitive damages award under the Supreme Court remittiture. Because the jury awarded 5 billion, as Your Honors all know. The remittiture went down to approximately 507. It's frankly a little light because they gave away some money here. But the foundation is the compensatory damages. We've got 5%. Exxon funds it. The money goes into the joint prosecution agreement, which we are totally out of. We don't even have to pay 3%. Mr. Estes has conceded that, and it's in the record in the letter. We're totally stand-alone. So on the compensatory damages, we've got 5%. That's from the initial monies paid. It's from the $8.5 million that we got when we faced down Exxon ourself on our go-it-alone situation. And it's the rest of the money on the interest on this compounded annually situation. So the money that Exxon puts into the pie, so to speak, on the direct action people, it goes into the Seattle. This is the compensatory damages. It went into the 11%, 3% to Navy corporations and 5% to us. The rest of the money goes to the joint prosecution agreement, the so-called matrix. And I want to just stop for a moment here. With all due respect to Judge Holland, he was right when he said that we can rescind the releases. He was right when he said that we can reassign. But he missed it on the language because the agreement that I agreed with Mr. Asking was, said that we will not go after money that is not merely awarded to but and collected by. And Judge Holland, unfortunately, put an or in there. But it all comes down to, as Your Honor recognizes, a commercial paper and a letter of credit. We have the end of the day. We've got the check. We've got the paper. We're here to collect. And I know this may be kind of rough words in a courtroom, but we're here for our slice of the pie. I know. Wait, what exactly is the commercial paper that you're talking about? The commercial paper is our reassignment. It's the proceeds of our settlement, the 2006 settlement. There's two settlements at issue here, the 2003 agreement or settlement with the plaintiff's committee. And I just want to note for a moment, if in fact we had just given up all the rights for punitive damages, it would have been a simple one-line document. We hear about give up all rights on punitive damages. But the way that is written, it's very careful. And we go our way, they go our way, and we don't go after money that they're collecting. And they're not collecting. And, Your Honor, if I could just for a moment here on this punitive damages. I had thought that you released all claims. Let me see what the ‑‑ I wrote down the language. Any and all claims known or unknown damages that may have been or may be sustained for the 89 and 90 seasons, and any and all claims for punitive damages in any way associated with the 89 running aground. I thought that was all released. Originally, in the original releases, it was, and those were rescinded. In 2003? In 2006. Yes.  Settlement with Exxon. With Exxon. With Exxon, yes. We got $8.5 million, we agreed to litigate over interest and attorney's fees, and for exceptionally valuable consideration, because we had probably, we were penciling out over $100 million in compensatory damages. We took 8.5, the interest money, the attorney's fees, and these reassignments. And Judge Holland said it was proper to rescind the releases, because originally this court said we were out of the matrix because of the releases. And we're not trying to get back in the matrix. We just rescinded the releases, and we took a reassignment. The seedback rights, just like commercial paper, I mean, and that's what happened on these peonies here. If I could just refer to this chart for a moment here, on the direct action money, the 11% goes into the Seattle 7 and bounces right back to Exxon, and that's what they just did in their 2008 stipulation. They paid $380 million into the court because they took off 70 of the cost, which Your Honor has just ruled on, and they took 11% off. It's a direct bounce back. And that's all that's happening here now, or should happen, is this money, and Exxon doesn't even have to pay that money into the court. They didn't pay it into the, they had an option. They could have paid it to the clerk, or at least take a credit. And so our position is we're here on these rescinded releases, which Judge Holland said they're proper, and the reassigned seedback, and we simply are collecting. What I don't understand is were the other plaintiffs a party to the rescission? To rescinding the releases? Yeah. No. Well, how could that? They don't have to be. I'm sorry. But you were rescinding your release of claims with respect to the other plaintiffs. No. No? No. Okay. The releases, in 1989 and 1990, there were releases of punitive damages and contemporaneous with assignments. They were similar to what was blessed by Your Honor in the court in the Seattle 7. When the Seattle 7 issue popped up and everybody got excited over it, they threw my clients out of the plaintiffs' committee. They said, you're out of the matrix because you've got similar releases. That all got appealed, and there was a couple appeals. The Ninth Circuit then said the seedbacks are fine from Seattle 7, but we agreed with Mr. Geraghty and with Mr. Esty and his order used to write, okay, we're not going to fight you anymore under the matrix. We're not going to say that we're entitled, and we went out of this joint prosecution agreement. We're just going our own way. Right. Those releases, those initial releases, were between us and Exxon in those assignments. And when we got to 2006, we rescinded them. They had nothing to do with the plaintiffs' committee. They didn't have any standing to talk about those releases. The 2003 agreement said that we're going our way, you go your way. And we got on the verge of trial in 2006, and we took the proceeds, which included the assignments. I'm just about out of my initial time. I want to save some for Mr. Weigelt, and I'll try and respond to Your Honor's questions again in rebuttal if I get maybe a minute or so in rebuttal. I'll give you another minute. All right. Thank you very much. The Court, please. Dave Esty, representing all plaintiffs as we've come to cloud room, which is all plaintiffs except these two processers and Seahawk. That's mine. In 2006. Plaintiff class, right? That's right, Your Honor. In 2006, when Polar Equipment and Nautilus sat down with Exxon to try to settle their re-innovated processor damages claim, they had two claims or one claim with two remedies, compensatory damages that had been reinstated and claim for punitive damages. Exxon had an absolute defense to the latter claim. They had a release, and this Court had adjudicated that that release was efficacious twice. Right. Prior to this 2006 meeting. And what Exxon agreed to do with that, there was no assignment to Exxon or seatback arrangement anywhere on the table in this dispute. Exxon, when they had assignments and seatbacks, took their money. They'd never ask anybody, these people or us, for any of the money. There's just not an assigned punitive damages claim here. It was a release, full and complete release that had been given. What Exxon agreed to was, and I quote from their agreement, first of all, the undersigned, this is speaking of Polar Equipment. This is the agreement entered into when? In 2006. The undersigned express release any and all claims for punitive damages in any way associated with the incident involving the MV Exxon Valdez on March 24. Quick Inlet absolutely and irrevocably releases and discharges Exxon. And that, from, I'm sorry, I've got the wrong piece here. This is a 2006 agreement. It's page 13 of our papers. It is the intent of the parties that this settlement agreement fully and finally resolve and release all claims of seafood processors and that seafood processors will have no other claims remaining against Exxon in the action that are based in whole or in part on the oil spill. And then it goes on. Notwithstanding any other, excuse me, any releases of claims of punitive damages given by Exxon, given to Exxon by seafood processors in 1980 and 1990 were rescinded. That's the rescission that they were talking about. That simply said Exxon giving up the defense. But what Exxon retained was seafood processors acknowledge and agree that they have no right to pursue punitive damages claims except as members of the mandatory punitive damages class. And they agree not to pursue their punitive damages claims against Exxon in any fashion whatsoever other than as such members. In 2003, they get in return for that $8 million in compensatory damages. It's a number plus interest. The processors had already agreed in 2003 that they had no right to participate in the recoveries of punitive damages by the mandatory punitive damages class. It's unequivocally clear. Because they were going to go off on their own. They chose to go pursue. To the 2006 agreement. That's precisely right. Wait a minute. Do I have this right now? In 2003, Poehler agrees with the class that it will not obtain any punitives from the class and releases all claims against the class for a share. And then in 2006, Poehler agrees with Exxon to release all claims for punitives except what it may obtain as part of the class. That's precisely right, John. And the argument is, yep, they retain whatever rights to punitives they have as part of the class, which is zero because they released them all. That's precisely right. So I understand. You understand it perfectly. They went to Exxon and Exxon said no. They had come to us and we had said no. And that ended the matter from our standpoint. As of 2003, these processors had given Exxon a complete release of punitive damages, were parties to the joint prosecution and sharing agreement, the effect of which was they would be required to share any compensatories they recovered, were excluded from the plan of allocation and the processor distribution plan and by reason of their having given the release to Exxon, which had been adjudicated by this court, the exclusion was reaffirmed by the district court in the final judgment, Order 351, entered in 2002, which incorporated into the plan of allocation and distribution plans this court's ruling in the Seattle 7 and in the Poehler Seahawk Appeal. And they had a suit pending against Exxon for compensatory and punitive damages in 2003. Finally, they were fully aware that whatever they recovered in such suit, 97.9% of it would have to go into the common pot to be shared under the JPSA and the plan of allocation. The 2.5% was the processor category of damages. With matters in this posture, they came to us and said we want to go our own way completely and pursue whatever claims for compensatory and punitive damages we have and we don't want to share them with you. Well, this was our third time around with these folks and so we basically said if you all relinquish any right to participate in the punitive damages award in this case, it comes to us and there is only one. The plan of allocation covers every dime of punitive damages awarded to the plaintiff class. Seattle 7's allocation goes out through the plan and the plan provides for it. The five native corporations go out through the plan and the plan specifies that. There are no recoveries other than this one and they gave up their rights to it. And it's as simple as that. And what we did was in order to be rid of these folks once and for all, you can go your own way. We're tired of litigating with you and here I am again today still litigating with them. But there's no question that if you leave the 2003 agreement. I don't think any of us are very happy to be here today. Certainly not, not in this case. If you leave the 2003 agreement, no sensible reading of it in the context in which it's concluded could drive any other conclusion but that they relinquish any right to participate in the recoveries. Do we need to decide anything in the case other than whether the 2003 agreement binds the parties, if we agree with your interpretation of it? No. That's all we need to decide. Thank you. Are there any questions? I don't think there are any. Good morning, your honors. For the record, my name is Ed Weigelt and I represent Nautilus Marine Enterprises. With all due respect to counsel, both counsel, I would somewhat disagree with their recitation of the facts and their laying out what this agreement is about and how we got here and why we're here today after 20 years. In 1989, Nautilus Marine Polar Panel, like thousands of others, in fact, probably like everybody who was in the fisherman class, whose $270 million is on that board over there in the pie, signed a certain document. It's a required document signed by Exxon. What it was was a release and assignment of claims. With all due respect to this court, what was litigated was whether or not one portion, one page of that two-page document's release portion was a release which barred Nautilus Marine Polar Panel from asserting a punitive damage claim. This court said yes. Now, what this court did not address was what about page two of that document, which was the assignment, the same assignment signed by thousands and thousands of plaintiffs who are participating, and the reason they're participating is because Exxon did one thing. They said, we're rescinding that original release and assignment. That's the background that leads to the plaintiff's fisherman's class, $270 million worth over there, plus the Seattle Seven, partially Seahawk, and others we don't know because we have a don't tell, don't ask policy, so we don't know the details there. Judge Holland wouldn't let us take discovery on that point. But what happened then is as of 2003, we did not have any rights to punitive damages. They were held by Exxon. We can't affect Exxon's rights. We didn't have any, but we did have something else. We had the rights to participate under the Joint Prosecution Agreement. That was a contractual obligation that plaintiffs' committee signed and said they're going to give us a share. But what happened at that juncture is offensive. They said, you know what, plaintiffs' committee, Nautilus Polar Panel, your original claims were dismissed for lack of causation by the trial court. They got reinstated, so we're not part of that pie yet. Those claims got reinstated. They're not insignificant claims, your honors. They're huge claims. But the plaintiffs' committee decided to do one thing. We don't want to litigate those claims. Even though they're reinstated and approved by this court, we don't want to go to trial. We don't want to go to trial because this can slow up our $5 billion punitive damage judgment. So here's the deal. You can share in the compensatory pie, which, oh, by the way, we went to trial and got $270 awarded, but Exxon had already paid $250. There's $19 million there. We are going to approve nearly $2 billion to get paid out of that pie, and you get that share. But because you had that release and Exxon may have this assignment, you don't get any punitive damages. I'm having trouble following this. There have been so many pieces of the litigation that it's probably because I failed to remember something accurately or am confusing some things. As I recall the Seattle 7 cases, they settled with Exxon, but Exxon had a concern that it would pay the same punitive damages twice, basically. So instead of purporting to settle with them on the punitives, Exxon made a deal with them that their share of the punitives would go back to Exxon. Correct. And we held that that was not against public policy because it was the only practical way that there could be a settlement. Then subsequently there was a settlement between the Seattle 7 plaintiffs and the plaintiffs' class so that the Seattle 7 plaintiffs would not share in the plaintiffs' class. Is that right or is that wrong? Somewhat. At that juncture, this Court had held that Exxon held the rights of punitive damages of the Seattle 7 and that the Plaintiffs' Committee would have had to have paid them. The settlement with the Plaintiffs' Committee was merely as to the amount that would be paid or offset by Exxon under their assignments as holders of the claims of the Seattle 7 group. Right, but the right to pursue the punitives was still with them. Was still held by Exxon. So when we come to this agreement in 2003, Exxon holds those punitive damage rights. What is at issue in the 2003 agreement are the rights under the joint prosecution agreement, okay? And in that context, I'm going to emphasize one thing about this document. It's a 12-page document. It's rich. Many counsel are involved. It's a complex and confusing document. This is the joint prosecution agreement? No, the 2003 agreement. I'm talking about the 2003 agreement. That is the subject of this appeal. And the issue before this Court is a contract interpretation issue. It's an ultimate issue. There's some evidentiary issues because Holland didn't give us literally her day in court. But in the context of the 2003 agreement, it was the joint prosecution agreement rights which were at issue because the punitive damage rights were held by Exxon. Right, but at the end of the day, under the 2003 agreement, you agreed to be bound by the distribution orders 351 and 352. Why doesn't that end it? Regardless of what was released, regardless of which rights were retained, you agreed to be bound by those orders. Okay. What we also agreed to and what the plaintiffs' committee also agreed to is that we would get all the fruits of our settlement and all recoveries pursuant to a later settlement or recovery from Exxon. There's correlating obligations, so you have to read those together, okay? What was anticipated was that if we were able to do what the fisherman had done, in other words, receive the original release, get the assignment back, that what would have to happen is that there would be an amendment to Order 351 or a separate order. But that language isn't in the contract. The contract says, and I'm just reading it, agree that each of them are bound by the terms and conditions of Order 351 and Order 352 for all purposes. So to reach your conclusion, we have to say that doesn't mean what it said. No. I would respectfully disagree with that comment, Your Honor. And the reason for that is because, again, it was contemplated we get the fruits of our settlement. That would constitute, if there was a rescission of the 89 release and a reassignment back to us, that would have been a new set of facts. It's like a car accident. Right. But, I mean, if you would have said unless or if, but that doesn't say that in that small clause. I realize that there are other obligations in there, which you're releasing. Okay. Or retaining. The Order 351, in the context as it existed in 2003, doesn't exist anymore. It's been changed. It's been modified. It's been revised because of different changes in circumstance and events afterwards. Where six years after the fact, you know, amongst, in fact, there's a stipulation entered, I believe, October of last year between Exxon and the Plaintiffs Committee. And what that addresses is the amount, the payment mechanisms, other allocations all superseding Order 351. All that was contemplated, if nothing else had changed, if the facts on which this claim were predicated had not changed, Order 351 would be in effect. We wouldn't be standing here today. But the facts did change. The facts that changed were that we acquired the rights from Exxon and not only the reassignment, but the original release from 89 was rescinded and nullified, just as it had been for thousands and thousands of fishermen. So there was a material change of fact after 2003. And in the law of releases, even if I have a blanket release, and I'll give my analogy, if you don't mind, very briefly. Judge Thomas, you and I are involved in a car accident on Monday. You know, it's my fault. I apologize. I pay you some money, and you give me a blanket release, the most blanket release in the world, any and all claims, every type, kind, nature, description, now existing, arising hereafter, forever, never, never. On Tuesday, I write you a check. I sign the release. And on Wednesday, I hit you a second time. I'm a really bad driver, and I hit you again. Does my release, the release that was given to me on Tuesday, stop you from asserting the claims that arose on Wednesday? The answer is absolutely not, irregardless of the scope of that document. Counsel, that strikes me as central to your argument and problematic. The release, in this case, just like the release in that hypothetical case said, arising out of the 1989 running aground. It does not. Excuse me. I can't see what second accident there is. The second accident is the holder of the rights. But if you look at the 2003. There has to be a second cause of damages, and I can't see. Okay. What makes your hypo work is there was a second car accident because the first one would have said everything arising out of the Monday car accident from the beginning of time to the present day. Even if the law changes. And in the future. Okay. And then you get a new accident. Well, the release spoke to the old one. But here, all you've got is the 89 running aground. Could you answer that very briefly? Yes. The 2003 agreement, conspicuously missing from that document. Are you referring to the 2003 settlement agreement? Yes. What's missing is the reference to the word oil spill. The only context that the word oil spill is there is in the context of a reservation of claims. What it says, the scope of a release is not the adjectives that describe the damages. It's the factual event. What's the factual event that is underpinning this particular release? It's called the extant dispute. What's the extant dispute? The joint prosecution agreement. It has a number of definitions, but it doesn't say oil spill. And it doesn't say order 204. Okay. Thank you. Thank you, Your Honor. My pleasure. Oil spill on page 1. Go ahead. Never mind. Yeah. Okay. Do you want to have 30 seconds? Because this case has gone on for decades. We'll give you 30 seconds, and that's it. Judge Kleinfeld, we did not release claims against the award. We are not suing the plaintiffs' committee. We're simply trying to collect the exon proceeds. The 2003 agreement, the collected by language, is crucial. Paragraph 3 at ER0055 says that we release any share of punitive damages awarded to and collected by plaintiffs. So we're simply trying to collect from exon. They don't own the judgment. Okay. All right. That's fine. I think you've clarified that. Thank you. Thank you very much. The matter just argued is submitted for decision.
judges: Schroeder, Kleinfeld, Thomas